Eric B. Fastiff (State Bar No. 182260)
efastiff@lchb.com
Brendan P. Glackin (State Bar No. 199643)
bglackin@lchb.com
Lin Y. Chan (State Bar No. 255027)
lchan@lchb.com
Katherine C. Lubin (State Bar No. 259826)
klubin@lchb.com
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-10008

Brad R. Sohn
brad@sohn.com
THE BRAD SOHN LAW FIRM, PLLC
2211 S.W. Secoffee Terrace
Miami, FL 33133
Telephone: (310) 866-0001
Facsimile: (305) 397-0650

*Attorneys for Plaintiff Dax Dellenbach*
*(Additional Counsel listed on signature page)*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAX DELLENBACH, on behalf of himself and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, THE BIG TEN CONFERENCE, INC., PACIFIC 12 CONFERENCE, THE BIG TWELVE CONFERENCE, INC., SOUTHEASTERN CONFERENCE, ATLANTIC COAST CONFERENCE, THE AMERICAN ATHLETIC CONFERENCE, ATLANTIC SUN CONFERENCE, CONFERENCE USA, MID-AMERICAN CONFERENCE, MOUNTAIN WEST CONFERENCE, and SUN BELT CONFERENCE,<br><br>Defendants. | Case No. 14-3159<br><br>**<u>CLASS ACTION COMPLAINT</u>**<br><br>**<u>JURY DEMAND</u>** |

1    Plaintiff Dax Dellenbach, individually, and on behalf of the Class defined below, brings

2    this action against Defendants National Collegiate Athletic Association ("NCAA"), The Big Ten

3    Conference, Inc., Pacific 12 Conference, The Big Twelve Conference, Inc., Southeastern

4    Conference, Atlantic Coast Conference, The American Athletic Conference, Atlantic Sun

5    Conference, Conference USA, Mid- American Conference, Mountain West Conference, and Sun

6    Belt Conference (collectively "Defendants") for damages and injunctive relief under the antitrust

7    laws of the United States. Plaintiff, by his undersigned attorneys, alleges as follows:

8    **NATURE OF THE ACTION**

9    1.    The NCAA is the premier college sports association in the United States governing

10   top-tier football programs, which earn the NCAA and its member institutions billions of dollars in

11   revenue annually. The top-tier football programs participate in the Football Bowl Subdivision

12   ("FBS").

13   2.    Defendants and their member institutions, earn this revenue based on the athletic

14   talents of Plaintiff, and members of the Class he seeks to represent, who devote countless hours

15   training and competing in the NCAA's top-tier football programs. While Defendants, their

16   member institutions, and coaches, among others, have reaped the rewards of Plaintiff and the

17   Class' efforts, Defendants have unlawfully suppressed the remuneration available to these

18   athletes through horizontal per se illegal price-fixing arrangements.

19   3.    Competing in NCAA's FBS program is not recreational, but vocational; it is a full-

20   time job demanding not only on Class members' time and energy, but also their bodies.  For the

21   vast majority of athletes, the NCAA is the last stop in their athletic careers and, therefore, their

22   last opportunity to capitalize on their athletic talents.

23   4.    Defendants have jointly agreed and conspired with their member institutions (*i.e.*,

24   the colleges and universities on whose behalf Plaintiff and the Class compete) to deny these

25   athletes the compensation they would otherwise receive for their services in a competitive market.

26   5.    Defendants have enacted and enforced rules that limit the amount that players may

27   receive as compensation for their athletic services to what the NCAA terms "full grant-in-aid"

28   ("GIAs").  The GIAs cover only tuition, required institutional fees, room and board, and required

1   course-related books.  They are regularly touted as "full rides" or "full grant-in-aid" scholarships,

2   however, they fall short of covering the full cost of attending school.  The NCAA's own Bylaws

3   define "Cost of Attendance" as including not only those items covered by the GIAs, but also

4   supplies, transportation, and "other expenses related to attendance at the institution."  GIAs often

5   fall several thousands of dollars short of the "Cost of Attendance," which is calculated by every

6   NCAA member institution's financial aid office pursuant to federal regulations.

7         6.      The restrictive rules of the NCAA and member conferences and institutions

8   (participating in the FBS program) serve as the contract between Defendants and their

9   conspirators unlawfully restraining trade in violation of Section 1 of the Sherman Act. 15 U.S.C.

10   § 1.  In the several billion dollar FBS market, absent these artificial restrictions the NCAA's

11   member institutions would compete for talent by offering players at minimum the full Cost of

12   Attendance, and likely much more, rather than the significantly lower GIA.

13         7.      A joint study released by the National College Players Association ("NCPA") and

14   Drexel University's Sport Management Department, entitled *The $6 Billion Heist: Robbing*

15   *College Athletes Under the Guise of Amateurism*, found that average "full" athletic scholarship at

16   FBS schools left players with a scholarship shortfall of $3,285 on average and that, but for

17   Defendants' unlawful GIA cap, FBS student athletes would have received truly full athletic

18   scholarships plus an additional $6 billion between the period of 2011 and 2015.[1]

19         8.      Defendants' rules further provide for unlawful group boycotts of any institution or

20   player that refuses to comply with Defendants' price-fixing agreement. These rules are per se

21   illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1, and also constitute an unreasonable

22   restraint of trade under the Rule of Reason. As a direct result of Defendants' price-fixing and

23   group boycott arrangements, Plaintiff and the Class he seeks to represent are unable to market

24   their services as football players at competitive rates, resulting in substantial economic harm to

25   them.

26

27     [1] Ramogi Huma & Ellen J. Staurowsky, *The $6 Billion Heist: Robbing Coll. Athletes Under the Guide of Amateurism*, Nat'l Coll. Players Ass'n & Drexel Univ. (2012), http://www.ncpanow.org

28   [hereinafter, "NCPA-Drexel Study"].

## JURISDICTION AND VENUE

9.      Plaintiffs' claims arise under Sections 4 and 16 of the Clayton Act, 15 U.S.C.

§§ 15 and 26, and section 1 of the Sherman Act, 15 U.S.C. § 1.

10.      This Court has subject matter jurisdiction of this case under 28 U.S.C. §§ 1331 and

1337, and sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, because this action arises

under the federal antitrust laws. This Court also has subject matter jurisdiction pursuant to

28 U.S.C. § 1332(d), because this is a class action in which the matter in controversy exceeds the

sum or value of $5,000,000, exclusive of interest and costs, and in which some members of the

proposed Class are citizens of different states from any Defendant.

11.      Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton

Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391(b) and (c).

12.      This Court has personal jurisdiction over Defendants because, inter alia, they:

(a) transacted business throughout the United States, including in this District; (b) participated in

organizing intercollegiate athletic contests, and/or licensing or selling merchandise throughout the

United States, including in this District; (c) had substantial contacts with the United States,

including in this District; and (d) were engaged in an illegal anticompetitive scheme that was

directed at and had the intended effect of causing injury to persons residing in, located in, or

doing business throughout the United States, including in this District.

13.      In addition, the NCAA has also distributed revenues to universities within this

District. NCAA member institutions have recruited members of the Class from this District and

conducted transactions in the District, including offering and signing athletic scholarship

agreements, which are the subject of the unlawful action challenged in this matter. Furthermore,

Defendants reap substantial revenues via television agreements, including revenues for telecasts

aired in this District.

14.      Intradistrict Assignment: This action arises in Alameda County or San Francisco

County because that is where a substantial part of the events that give rise to the claims occurred.

Within Alameda County is found the University of California at Berkeley ("Cal").  Cal fields a

Football Bowl Subdivision men's football team, which competes in the Pac 12.  Current and

1    former college football players on this team have been subjected to the violations described

2    herein, and current college football players on this team are subject to the continuing violations

3    described herein.  Pursuant to Civil Local Rule 3-2(d), this action should be assigned to the San

4    Francisco Division or to the Oakland Division.

5                                                     **PARTIES**

6    **I.       Plaintiff**

7              15.      Plaintiff Dax Dellenbach is a resident of Weston, Florida.  Dellenbach received

8    multiple full GIA athletic scholarship offers for his football ability.  Dellenbach began his

9    collegiate career at Auburn University—the 2013 NCAA runner-up for the National

10   Championship—where he played on the football team in 2008 and 2009.  His position was long

11   snapper, also called deep snapper.  Auburn is a member of Defendant Southeastern Conference.

12   In 2010 Dellenbach transferred to Florida State University, where he played the same position.

13   The Florida Seminoles are a member of Defendant Atlantic Coast Conference, and are the

14   defending NCAA National Champions.

15             16.      From 2010 through 2012, Dellenbach started all games for Florida State, long-

16   snapping for virtually every field goal, point after touchdown kick, and punt over a span of

17   31 games.  In 2011, he was part of Florida State's special teams unit that was regarded as the best

18   in the nation and ranked No. 1 among FBS schools based on the Football Outsiders Efficiency

19   Ratings.

20             17.      Dellenbach received full GIA scholarships while attending Florida State and

21   Auburn.  The grant-in-aid money Dellenbach received from both Auburn and Florida State was

22   substantially less than his full Cost of Attendance.

23             18.      Dellenbach accepted offers to renew his athletic scholarship.  Dellenbach fulfilled

24   all athletic and academic requirements to maintain his scholarship, and was a student in good

25   standing at all times.  It was not feasible for Dellenbach to work during the academic year given

26   his academic and athletic obligations.

27

28

1  | **II.    Defendants**

2  |     19.    Defendant NCAA is an unincorporated association with its principal place of

3  | business in Indianapolis, Indiana.  The NCAA is comprised of more than 1,200 colleges,

4  | universities, and athletic conferences, located throughout the United States. The NCAA is

5  | engaged in interstate commerce, including by among other things, running its FBS program

6  | throughout the United States. During the Class Period, the NCAA collusively restrained trade in

7  | violation of the antitrust laws as alleged herein and thereby has damaged and will continue to

8  | cause damage to Plaintiffs and members of the Class unless enjoined.

9  |     20.    Defendants The Big Ten Conference, Inc., Pacific 12 Conference, The Big Twelve

10 | Conference, Inc., Southeastern Conference, and the Atlantic Coast Conference are collectively

11 | referred to herein as the "Power Conference Defendants." The Power Conference Defendants

12 | along with the American Athletic Conference, Atlantic Sun Conference, Conference USA, Mid-

13 | American Conference, Mountain West Conference, and Sun Belt Conference are collectively

14 | referred to herein as the "Conference Defendants." The Conference Defendants are engaged in

15 | interstate commerce, including by among other things, running the FBS program engaged in by

16 | their members throughout the United States, including selling the broadcast rights of their

17 | members' games for distribution throughout the United States.

18 |     21.    Defendant the Big Ten Conference, Inc. ("Big Ten") is a nonprofit corporation

19 | organized under the laws of Delaware, with its principal place of business located at 5440 Park

20 | Place, Rosemont, Illinois 60018. The Big Ten is a multi-sport athletic conference. Each of the

21 | Conference Defendants, including the Big Ten, profit significantly from their FBS program.

22 | According to the official Big Ten website, the Big Ten conference "manage[s] nearly

23 | 1,000 broadcast events, provide[s] legislative and compliance services, manage[s] 25 different

24 | sport championships and tournaments, provide[s] staff service to over 400 coaching and

25 | administrative personnel on Big Ten campuses, and services media and fans needs and interests

26 | for information about the Big Ten Conference." The Big Ten includes the following member

27 | institutions: University of Illinois at Urbana–Champaign, Indiana University, University of Iowa,

28 | University of Michigan, Michigan State University, University of Minnesota, University of

Nebraska– Lincoln, Northwestern University, Ohio State University, Pennsylvania State University, Purdue University, and the University of Wisconsin–Madison. On July 1, 2014, the University of Maryland and Rutgers University also joined the Big Ten. During the Class Period, the Big Ten collusively restrained trade in violation of the antitrust laws as alleged herein and thereby has damaged and will continue to cause damage to Plaintiffs and members of the Class unless enjoined.

22.     Defendant the Pacific 12 Conference ("Pac-12"), nicknamed the "Conference of Champions," is an unincorporated association, with its principal place of business located at 1350 Treat Boulevard, Suite 500, Walnut Creek, CA 94597. The Pac-12 is a multi-sport athletic conference. Each of the Power Conference Defendants, including the Pac-12, profit significantly from their FBS program. The Pac-12 has its own wholly-owned network, the Pac12Net. A USA Today report estimates that between Pac12Net and the conference's 12-year deal with ESPN and Fox, the Pac-12 could distribute as much as $30 million annually to each of its schools. The Pac-12 includes the following member institutions: University of Arizona, Arizona State University, University of California–Berkeley, University of Colorado, University of Oregon, Oregon State University, Stanford University, University of California-Los Angeles, University of Southern California, University of Utah, and Washington State University. During the Class Period, the Pac-12 collusively restrained trade in violation of the antitrust laws as alleged herein and thereby has damaged and will continue to cause damage to Plaintiff and members of the Class unless enjoined.

23.     Defendant The Big Twelve Conference, Inc. ("Big 12") is a nonprofit corporation organized under the laws of Delaware, with its principal place of business located at 400 East John Carpenter Freeway, Irving, Texas 75062. The Big 12 is a multi- sport athletic conference. Each of the Power Conference Defendants, including the Big 12, profit significantly from their FBS program. The Big 12 lists the following corporate partners on its website: Dr. Pepper, Gatorade, Phillips 66, Motel 6, GEICO, and Sonic. The Big 12 includes the following member institutions: Baylor University, Iowa State University, University of Kansas, Kansas State University, University of Oklahoma, Oklahoma State University, University of Texas at Austin,

Texas Christian University, Texas Tech University, and West Virginia University. During the Class Period, the Big 12 collusively restrained trade in violation of the antitrust laws as alleged herein and thereby has damaged and will continue to cause damage to Plaintiffs and members of the Class unless enjoined.

24.     Defendant the Southeastern Conference ("SEC") is an unincorporated association, with its principal place of business located at 2201 Richard Arrington Boulevard North, Birmingham, Alabama 35203.  The SEC is a multi-sport athletic conference. Each of the Power Conference Defendants, including the SEC, profit significantly from their FBS program. ESPN is reportedly paying the SEC $2.25 billion for broadcast rights to the SEC's football games from 2009 through 2025. Fox Sports Network also has rights to air seven SEC football games annually. All SEC schools are also affiliated with XM Radio. The SEC includes the following members: University of Florida, University of Georgia, University of Kentucky, University of Missouri, University of South Carolina, University of Tennessee, Vanderbilt University, University of Alabama, University of Arkansas, Auburn University, Louisiana State University, University of Mississippi, Mississippi State University, and Texas A& M University. During the Class Period, the SEC collusively restrained trade in violation of the antitrust laws as alleged herein and thereby has damaged and will continue to cause damage to Plaintiff and members of the Class unless enjoined.

25.     Defendant the Atlantic Coast Conference ("ACC") is an unincorporated association, with its principal place of business located at 4512 Weybridge Lane, Greensboro, North Carolina 27407. The ACC is a multi-sport athletic conference. Each of the Power Conference Defendants, including the ACC, profit significantly from their FBS program. The ACC entered into a deal with ESPN in 2013 for broadcasting rights through the 2026-2027 season that is reportedly worth $17 million per school per year, although sources say that number could go up. The ACC includes the following member institutions: Boston College, Clemson University, Duke University, Florida State University, Georgia Institute of Technology, University of Maryland, University of Miami, University of North Carolina, North Carolina State University, University of Virginia, Virginia Tech, Wake Forest University, University of Notre

Dame,[2] University of Pittsburgh, and Syracuse University. The University of Louisville joined the ACC on July 1, 2014. During the Class Period, the ACC collusively restrained trade in violation of the antitrust laws as alleged herein and thereby has damaged and will continue to cause damage to Plaintiff and members of the Class unless enjoined.

26.     Defendant American Athletic Conference, f/k/a The Big East Conference ("American"), is an incorporated association, with its principal place of business located at 15 Park Row West, 3rd Floor, Providence, RI 02903. American is a multi-sport athletic conference. Each of the Conference Defendants, including American, profit significantly from their FBS program. From 2014-15 through the 2019-2020 school year, American is expected to receive $20 million annually for both football and basketball through its contract with ESPN. American includes the following member institutions: University of Central Florida, University of Cincinnati, University of Connecticut, University of Houston, University of Louisville, University of Memphis, Rutgers University, Southern Methodist University, University of South Florida and Temple University.  In 2014-15, East Carolina University, Tulane University and the University of Tulsa will join American, and in 2015-16, the U.S. Naval Academy will join for football only. During the Class Period, American collusively restrained trade in violation of the antitrust laws as alleged herein and thereby has damaged and will continue to cause damage to Plaintiff and members of the Class unless enjoined.

27.     Defendant Atlantic Sun Conference, Inc. ("A-Sun") is a non-profit corporation organized under the laws of Georgia, with its principal place of business located at 3370 Vineville Avenue, Suite 108B, Macon, Georgia 31204-2332. The A-Sun is a multi-sport athletic conference.  For instance, an A-Sun member school made a historic postseason run in the NCAA March Madness tournament making a Sweet 16 appearance. Conference A-Sun expanded their existing TV deal with Comcast and ESPN3 in 2012. Conference A-Sun includes the following member institutions: East Tennessee State University, Florida Gulf Coast University, Jacksonville University, Kennesaw State University, Lipscomb University, Mercer University; Northern

---

[2] The University of Notre Dame is an ACC member in all sports except football. Notre Dame's football program, while independent, is part of NCAA's FBS.

1    Kentucky University, Stetson University, University of Southern Carolina Upstate, and

2    University of North Florida. During the Class period, Conference A-Sun collusively restrained

3    trade in violation of the antitrust laws as alleged herein and thereby has damaged and will

4    continue to cause damage to Plaintiff and members of the class unless enjoined.

5        28.    Defendant Conference USA is an incorporated association, with its principal place

6    of business located at 5201 N. O'Connor Blvd, Irving, Texas. Conference USA is a multi-sport

7    athletic conference. Each of the Conference Defendants, including Conference USA, profit

8    significantly from their FBS program. Conference USA signed a television deal in early 2011

9    with FOX and CBS, worth $14 million per year. Conference USA includes the following member

10   institutions: University of North Carolina-Charlotte, Florida International University, Florida

11   Atlantic University, Louisiana Tech University, Middle Tennessee State University, University of

12   North Texas, Old Dominion University, University of Texas-San Antonio, East Carolina

13   University, Marshall University, Rice University, University of Southern Mississippi, Tulane

14   University, University of Tulsa, UAB, and University of Texas-El Paso.[3] During the Class Period,

15   Conference USA collusively restrained trade in violation of the antitrust laws as alleged herein

16   and thereby has damaged and will continue to cause damage to Plaintiff and members of the

17   Class unless enjoined.

18       29.    Defendant the Mid-American Conference ("MAC") is an incorporated association,

19   with its principal place of business located at 24 Public Square, 15th Floor, Cleveland, OH

20   44113-2214. The MAC is a multi-sport athletic conference. Each of the Conference Defendants,

21   including the MAC, profit significantly from their FBS program. In 2009 ESPN signed a multi-

22   year deal with the MAC that provided for a minimum of 25 events annually to be produced and

23   aired on an ESPN platform. In February of 2014, ESPN and MAC announced they had agreed to

24   a deal to allow ESPN to launch a digital MAC Conference Channel. The MAC includes the

25   following member institutions: University of Akron, Ball State University, Bowling Green State

26   University, University of Buffalo, Central Michigan University, Eastern Michigan University,

27

28   _____

[3] Old Dominion University and the University of North Carolina–Charlotte are not members of
the conference for football.

1  Kent State University, Miami (Ohio) University, Northern Illinois University, Ohio University,

2  University of Toledo, University of Massachusetts, and Western Michigan University. During the

3  Class Period, the MAC collusively restrained trade in violation of the antitrust laws as alleged

4  herein and thereby has damaged and will continue to cause damage to Plaintiff and members of

5  the Class unless enjoined.

6        30.    Defendant Mountain West Conference ("MWC") is an incorporated association,

7  with its principal place of business located at 10807 New Allegiance Dr., Suite 250, Colorado

8  Springs, CO 80921. MWC is a multi-sport athletic conference. Each of the Conference

9  Defendants, including MWC, profit significantly from their FBS program. In 2013, MWC

10  announced an agreement in principle for ESPN to carry the rights for football and men's

11  basketball starting in 2013 and ending after the 2019-20 season for $116 million. MWC includes

12  the following member institutions: Boise State University, California State University-Fresno,

13  U.S. Air Force Academy, Colorado State University, San Diego State University , San Jose State

14  University, University of New Mexico, University of Nevada-Las Vegas, University of Nevada-

15  Reno, Utah State University, University of Wyoming, and University of Hawaii-Mānoa.[4] During

16  the Class Period, MWC collusively restrained trade in violation of the antitrust laws as alleged

17  herein and thereby has damaged and will continue to cause damage to Plaintiff and members of

18  the Class unless enjoined.

19        31.    Defendant Sun Belt Conference ("Sun Belt") is an incorporated association, with

20  its principal place of business located at 1500 Sugar Bowl Drive, New Orleans, LA 70112. The

21  Sun Belt is a multi-sport athletic conference. Each of the Conference Defendants, including the

22  Sun Belt, profit significantly from their FBS program. The Sun Belt entered into a deal with

23  ESPN in 2011 for broadcasting rights through the 2019-20 season. The Sun Belt includes the

24  following member institutions: Arkansas State University, Georgia State University, University

25  of Louisiana-Lafayette, University of Louisiana-Monroe, University of South Alabama, Texas

26  State University, Troy University, Western Kentucky University, University of Arkansas-Little

27

28  _____

[4] The University of Hawaii-Mānoa is a member for football only.

Rock and University of Texas-Arlington.[5] In 2014, Appalachian State University and Georgia Southern University will join as all-sports members and University of Idaho and New Mexico State University will join as football playing members. During the Class Period, the Sun Belt collusively restrained trade in violation of the antitrust laws as alleged herein and thereby has damaged and will continue to cause damage to Plaintiff and members of the Class unless enjoined. As is stated on its website, like other FBC members:

> Because of its status as a member of the Football Bowl Subdivision, the Sun Belt Conference has a permanent seat on the NCAA's 18-member Board of Directors. As a result, the conference has a crucial voice on some of the most pressing issues in college athletics and will always have a role in the implementation of any future NCAA legislation and guidelines.

32.     All allegations that a Defendant engaged in an act, deed or transaction means that the Defendant engaged in the act, deed, or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control, or transaction of Defendant's business or affairs.

## III.   Co-Conspirators

33.     Various other individuals, partnerships, corporations, and associations, including other NCAA conferences and NCAA member schools, as well as others whose identities are presently unknown to Plaintiffs, have participated as unnamed co-conspirators with Defendants in the antitrust violations alleged herein. All averments herein against any named Defendant are also averred against these unnamed co-conspirators as though set forth herein at length.

34.     The acts that this Complaint alleges were done by each of the co- conspirators were fully authorized by each of these co-conspirators, or ordered, or done by duly authorized officers, agents, employees, or representatives or each co-conspirator while actively engaged in the management, direction, or control of its affairs.

35.     At all relevant times, each co-conspirator was an agent of Defendants and each of the remaining co-conspirators, and in doing the acts alleged herein, was acting within the course

---

[5] The University of Arkansas-Little Rock and University of Texas-Arlington are not members of the conference for football. On July 1, 2014, Western Kentucky University will leave the conference and join Conference USA.

1  and scope of such agency. Defendants and each co-conspirator ratified or authorized the wrongful

2  acts of Defendants and each of the other co-conspirators. Defendants and their co-conspirators are

3  participants as aiders and abettors in the improper acts and transactions that are the subject of this

4  action.

5  ## CLASS ACTION ALLEGATIONS

6       36.     Plaintiff brings this action on behalf of himself and as a class action under the

7  Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of all members of the

8  following Class:

9          All persons who received or will receive athletic grant-in-aids
("GIAs") for participation in college football from a College or
10          University that is a member of the Pac 12 Conference, the Big Ten
Conference, the Big 12 Conference, the Southeastern Conference,
11          the American Athletic Conference, Atlantic Sun Conference,
Conference USA, Mid-American Conference, Mountain West
12          Conference, and Sun Belt Conference, or the Atlantic Coast
Conference, at any time between four years prior to the filing of this
13          Complaint and the date of judgment in this matter.

14       37.     Members of the Class are so numerous and geographically widespread such that

15  the joinder of all members is impracticable. The NCAA bylaws state that FBS schools are

16  allowed 85 full football GIAs per year. There are currently 123 FBS schools participating in D-IA

17  football.

18       38.     Plaintiff's claims are typical of the claims of the members of the Class because

19  Plaintiffs and all members of the Class sustained damages arising out of Defendants' uniform

20  rules and common course of conduct in violation of the law as alleged herein. All members of the

21  Class have been or will continue to be subject to uniform agreements, rules, and practices among

22  Defendants that restrain competition for player services, including but not limited to, the NCAA

23  bylaws and conference rules discussed infra. Defendants' unlawful uniform agreements, rules and

24  practices apply uniformly to all members of the Class. As a result of Defendants' unlawful

25  agreements that uniformly apply to all NCAA member institutions, the National Letter of Intent

26  ("NLI") and financial aid agreements signed by Plaintiffs and members of the Class are virtually

27  identical. Plaintiffs' injuries, and the injuries of each member of the Class, were directly caused

28  by Defendants' unlawful conduct as alleged herein.

39.     Plaintiffs will fairly and adequately protect the interests of the Class as the interests of the Plaintiffs are coincident with, and not antagonistic to, those of the Class or each Subclass. In addition, Plaintiffs are represented by counsel with experience and competency in the prosecution of complex antitrust class actions.

40.     The prosecution of separate actions by individual members of the Class or each Subclass would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

41.     Questions of law and fact common to members of the Class predominate over questions that may affect only individual members. Among question of law and fact common to the Class are:

     a.     whether Defendants' agreements, rules, and practices restrained competition for player services;

     b.     whether Defendants' conduct caused members of each of the Class to receive less money for their playing service than they would have in a competitive market;

     c.     whether Defendants' conduct violated Section 1 of the Sherman Act;

     d.     the appropriate measure of monetary relief, including the appropriate class-wide measure of damages for the Class; and

     e.     whether members of the Class are entitled to declaratory and/or injunctive relief.

42.     Class action treatment is superior to alternatives for the fair and efficient adjudication of the controversy alleged herein. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail. No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy. The Class are readily ascertainable from Defendants' records.

43.     Defendants have acted on grounds generally applicable to the entirety of the Class, thereby making final injunctive relief or corresponding declaratory relief appropriate to the Class as a whole.

## INTERSTATE TRADE AND COMMERCE

44.     Defendants and their co-conspirators are in the business of governing and operating major college football businesses, including the sale of tickets and telecast rights to the public which feature the individual and collective efforts of players such as Plaintiffs and members of the Class. Defendants' sales are made to individuals and businesses located throughout the United States, including in this District. During the Class Period, Defendants did and will continue to transact business in and across state lines in a continuous and uninterrupted flow of interstate commerce throughout the United States.

45.     Defendants' business activities that are the subject of this Complaint were within the flow of and substantially affected interstate trade and commerce. The anticompetitive conduct alleged in this Complaint has a direct, substantial, and foreseeable adverse effect on United States commerce. Defendants' interstate activities include, but are not limited to interstate: travel, communications, sales of tickets, sales of merchandise, advertisements and other promotions, broadcasting of games, employment of coaches and other personnel, recruitment of players, and negotiations of all of the foregoing.

46.     As established in more detail *infra*, Defendants' and their co-conspirators' interstate businesses generate billions of dollars of commerce.

47.     Plaintiffs and members of the Class have been recruited by one or more of Conference Defendants' member institutions, pursuant to their rules, practices, and procedures at issue in this action, in interstate commerce as top-tier college football players.

## RELEVANT MARKETS

48.     There is a distinct relevant market for NCAA D-IA Football Bowl Subdivision ("FBS") football player services. The market represents the highest level of intercollegiate competition for football, and is a unique opportunity for player services for which there are no substitutes.

49.     NCAA D-IA football programs are distinct from the NCAA's lower division programs (*i.e.*, Divisions II and III). D-IA football is the highest level of competition and generates billions of dollars in revenue from ticket sales, broadcasting rights, corporate sponsorships, merchandise sales and licensing, and alumni contributions. These superior revenues allow D-IA football programs to provide superior coaching, playing and training facilities, and travel opportunities. These are critical factors in recruiting and provide teams with an edge in landing superior talent.

50.     NCAA D-IA football is further divided into two subdivisions, the FBS and Football Championship Subdivision ("FCS"). These subdivisions constitute distinct submarkets within the broader labor market for D-IA football college players.

51.     As the NCAA states itself, the FBS submarket represents the very highest level of college football competition. The FBS generates higher revenues, has higher attendance, offers more athletic scholarships, and has larger budgets than the FCS. The post-season formats of the FBS and FCS also differ. As its name implies, the FBS season is capped off by lucrative invitational bowl games,[6] whereas the FCS ends in an NCAA- sponsored championship tournament.[7] The Conference Defendants are part of the FBS. Plaintiffs seek damages and injunctive relief with respect to the FBS submarket only.

52.     There are no substitutes for the FBS Football Players Market. For a prospective or current college football player, participating in the FBS provides the opportunity to compete at the highest level of college football while earning a college degree.  It also offers the best

---

[6] Starting next season, the FBS postseason will feature a newly created College Football Playoff ("CFP") consisting of four teams that will compete for a chance to advance to the national championship game. In 2015, the two semifinal games will be the Rose Bowl and Sugar Bowl, culminating in a "National Championship" game in Arlington, Texas. As the NCAA's official "College Football Playoff" website explains, under the new structure "[e]ach semifinal will be played during the New Year's holiday with the national championship game in prime time on a Monday night at least a week later." This is a strategic move to maximize the value of the games' broadcasting rights and sponsorship deals.

[7] ESPN has reportedly agreed to pay $220 million annually to the major conferences for the right to broadcast major bowl games, including $80 million annually for the right to broadcast the Rose Bowl from 2015 through 2026. In years where the Rose Bowl is not included in the new College Football Playoffs, the $80 million will be split between the Big Ten and Pac-12's twenty-six member schools.

1    prospect of advancement to a professional football career. Players in the FBS are, on balance, the

2    most talented players outside of the National Football League ("NFL"). The FBS is the highest

3    level at which football players of traditional college age can provide their services as the NFL

4    expressly bans players who have not been out of high school for at least 3 years.

5           53.     There is no reasonable substitute where players of this age can provide their

6    football playing services. Other professional or semi-professional football leagues, like lower

7    level college divisions, do not offer nearly the level of competition, coaching, funding, or

8    exposure as FBS football for players who are not yet eligible for the NFL. Because only a tiny

9    fraction of FBS players will reach the NFL, the FBS Football Players Market is the last chance

10   these players have to realize economic compensation for their talents as football players. Because

11   of the uniquely superior experience offered by the FBS, prospective college players that are

12   talented enough to play FBS football very rarely choose to pursue alternatives to playing in the

13   FBS.

14          54.     The relevant geographic market is the United States. The FBS Players Market is

15   national in scope. FBS colleges and universities recruit players from all over the United States,

16   including in this District. For example, the geographic diversity represented by the most recent

17   recruiting class signed by Pac-12 member Stanford University, located in Stanford, California,

18   includes members from Louisiana, Oregon, Washington, Florida, and California. Tor fellow Pac-

19   12 member the University of California at Berkeley, located in Berkeley, California, the most

20   recent recruiting class includes players from Washington, California, and Florida.

21          55.     Despite the fact that member institutions of Conference Defendants compete for

22   the services of the most talented football players in the country to play in the FBS, because of

23   Defendants' anticompetitive conduct, these colleges and universities cannot and do not offer

24   players a penny more than a full GIA, an amount that is not even sufficient to cover the players'

25   cost to attend the schools for which they play, much less compensate them for their athletic

26   services.

27

28

# FACTUAL ALLEGATIONS

## I.     Background on the NCAA and the Formation of the Illegal Cartel

56.     According to the NCAA's website, the NCAA was founded in 1906 to "protect young people from the dangerous and exploitive athletic practices of the time."

57.     In the early days, no formal NCAA rulebook existed, but payment to athletes in any form was prohibited. Later, the NCAA allowed its member schools to provide athletes with minimal compensation to cover tuition payments and some related expenses, but only at amounts set (*i.e.*, price-fixed) by the NCAA.

58.     The NCAA began as only a single division with a uniform set of rules. Eventually, the NCAA split into three divisions with individual rules for each division. The separate divisions represented not only philosophical differences among the member institutions related to the commercial scale of college sports, but also economic differences.

59.     Although the NCAA maintains that its foundational concept is amateurism (its primary "justification" for not paying its athletes), there is nothing amateur about the millions of dollars a year paid to coaches, athletic directors, conference presidents, and NCAA executives. There is likewise nothing "amateur" about the billion dollar business that is FBS football.

60.     The typical college football player will have at least 28 hours of commitments each week, notwithstanding the requirement in order to satisfy those commitments he must first remain academically eligible.

61.     The NCAA admits that it operates by way of horizontal agreements among its members. For example, in its Financial Statements[8] the NCAA states that it "is the organization through which the colleges and universities of the nation speak and act on athletic matters at the national level"; "[t]hrough the NCAA, its members consider any athletics issue that crosses regional or conference lines and is national in character"; and the NCAA "serves as the colleges' national athletics governing agency."

---

[8] National College Athletic Association and Subsidiaries, Consolidated Financial Statements as of and for the Years Ended August 31, 2013 and 2012, Supplementary Information as of and for the Year Ended August 31, 2013, and Independent Auditors' Report, available at http://www.ncaa.org/sites/default/files/NCAA_FS_2012- 13_V1%20DOC1006715.pdf (last visited April 18, 2014).

62.     The NCAA confirms the role of its co-conspirator member institutions on its website stating that its "active member institutions and voting conferences are the ultimate voice in all Association decisions."[9]

63.     The NCAA further confirms the role of the Conference Defendants, in addition to other unnamed co-conspirators. The NCAA states in its Financial Statements that: "[i]n Division I, the legislative system is based on conference representation and an eighteen member Board of Directors that approves legislation" and the NCAA's "governance structure also includes an Executive Committee composed of sixteen chief executive officers (member institution chief executive officers) that oversee association- wide issues, which is charged with ensuring that each division operates consistently with the basic purposes, fundamental policies, and general principles of the NCAA." The NCAA further states on its website that its D-IA Board of Directors includes "[e]ighteen members comprised of chief executive officers (CEOs)" on which "[a]ll 11 Football Bowl Subdivision conferences have a permanent seat."[10]

## II.    The NCAA's History of Anticompetitive Conduct

64.     The NCAA is no stranger to allegations of anticompetitive conduct in violation of the antitrust laws. For example, in *NCAA v. Board of Regents*, 468 U.S. 85 (1984), the Supreme Court held that the NCAA violated Section 1 of the Sherman Act by limiting the number of live televised football games under its media play for the 1982-1985 football seasons and granted Plaintiffs' request for injunctive relief. Similar to the NCAA's monitoring and punishment techniques alleged in this action, consistent with its media plan, the NCAA had announced it would punish any member institution that abided by a competing agreement with another network. *See Board of Regents*, 468 U.S. at 95.

65.     The Tenth Circuit similarly upheld a summary judgment ruling that an NCAA cap on part-time coaches' salaries was an unlawful restraint of trade in violation of Section 1 of the Sherman Act.[11] *Law v. NCAA*, 134 F.3d 1010 (10th Cir. 1998). And in *Metropolitan*

---

[9] NCAA, About Membership, available at http://www.ncaa.org/about/who-we- are/membership (last visited April 18, 2014).

[10] The FBS has since consolidated its eleven conferences into ten conferences.

[11] As a result of this ruling, salaries for part-time coaches significantly increased.

1    *Intercollegiate Basketball Association v. NCAA*, No. 01-cv-00071 (S.D.N.Y.), five of the

2    NCAA's member institutions (Fordham University, Manhattan College, New York University,

3    St. John's University, and Wagner College) sued the NCAA for engaging in anticompetitive

4    conduct to harm the National Invitational Tournament ("NIT"), which was in competition with

5    the NCAA's lucrative NCAA "March Madness" Tournament. That action was resolved when the

6    NCAA agreed to the NIT's continued operation and to pay a significant settlement to the

7    plaintiffs.

8        66.     The NCAA was also sued by a class of football and basketball players in a case

9    similar to the current action for illegally suppressing athlete compensation in violation of the

10    Section 1 of the Sherman Act in *White v. NCAA*, No. CV06-0999, (C.D. Cal.). The parties

11    reached a short-term settlement in *White* (which has since expired), but not before the White

12    Court denied the NCAA's motion to dismiss, ruling that plaintiffs had adequately pled a relevant

13    market and harm to competition, and certified a class. Unfortunately, the White settlement did not

14    put an end to the NCAA's anticompetitive behavior suppressing player compensation, thus

15    necessitating the current action.

16    **III.**     **FBS Football is Highly Commercialized and Profitable**

17        67.     FBS Football is far from "amateur" when it comes to generating revenues and

18    profits for the NCAA and its member institutions. FBS Football is one of the most lucrative

19    sports institutions in the United States. Upon information and belief, in the 2012 reporting year,

20    D-IA football generated over $3 billion in revenues.

21        68.     The concluding games of FBS football are particularly lucrative.  ESPN reportedly

22    is paying $5.64 billion for a 12-year contract, $470 million annually, for broadcast rights to the

23    FBS's new playoff format. According to ESPN President John Skipper, "Because of college

24    football's widespread popularity and the incredible passion of its fans, few events are more

25    meaningful than these games."

26        69.     The NCAA's conferences also profit directly from network deals. For instance, the

27    Big Ten has its own conference-owned television network, the Big Ten Network ("BTN"), which

28    was established in 2006 via a 20-year agreement with Fox Cable Networks. According to the

official Big Ten website, "BTN is in 51 million homes in the United States and Canada, through agreements with more than 300 cable, satellite and telecommunications providers, and is available internationally in 20 countries." The Big Ten also has a contract with ABC/ESPN to broadcast Big Ten events, including FBS football.

70.     Although players are denied fair compensation for their services, the same is not true for coaches. "Coaches' pay has even outpaced the pay of corporate executives, who have drawn the ire of Congress and the public because of their staggering compensation packages. Between 2007 and 2011, CEO pay — including salary, stock, options, bonuses and other pay — rose 23%, according to Equilar, an executive compensation data firm. In that same period, coaches' pay increased 44%."[12]16 For example, in 2011 Florida State football coach Jimbo Fisher received a salary increase of roughly $950,000. This increase alone was almost three times the amount it would take to pay for the entire football team's 2010-11 scholarship short fall, which was approximately $351,900. See NCPA-Drexel Study at 9-10.

71.     Despite their astronomical profits, Defendants are no doubt going to try to hide behind their wholly unsupported and factually contradicted claims of amateurism. Economists, sports management professors, and other experts agree – the NCAA's claims of "amateurism" are nothing more than a cover for their illegal, anticompetitive conduct and are not based in the reality that is the big business of FBS football. The following are just a few examples of academics and practitioners' view on the NCAA's claims of "amateurism:"

    a.    The NCAA's characterization of these athletes as student-athletes, and not employees, lies at the core of another broader fallacy: that NCAA D- IA football and men's basketball are, in fact, amateur. On the contrary, these sports are not amateur except in the pernicious sense that the "employee-athletes" who produce the product receive no market wage. In fact, these major college sports have not truly been amateur for many years, if ever."[13]

    b.    Every now and then, I run a contest to choose the best

[12] Erik Brady, Steve Berkowitz, & Jodi Upton, *College Football Coaches Continue to See Salary Explosion*, USA Today, Nov. 20, 2012, http://www.usatoday.com/story/sports/ ncaaf/2012/11/19/college-football- coachescontracts-analysis-pay-increase/1715435/.

[13] Robert A. McCormick & Amy Christian McCormick, *The Myth of the Student-Athlete: The College Athlete as Employee*, Washington Law Review, 71, 74-75 (2006).

- 20 -

monopoly operating in America.  This time, the finalists, chosen by a panel of Harvard University economists, are: The U.S. Postal Service, OPEC, Microsoft Corp., the International Longshore & Warehouse Union (ILWU), and the National Collegiate Athletic Assn. (NCAA). . . . The NCAA is impressive partly because its limitations on scholarships and other payments to athletes boost the profitability of college sports programs. But even more impressive is the NCAA's ability to maintain the moral high ground. For example, many college basketball players come from poor families and are not sufficiently talented to make it to the National Basketball Assn. Absent the NCAA, such a student would be able to amass significant cash during a college career. With the NCAA in charge, this student remains poor. Nevertheless, the athletic association has managed to convince most people that the evildoers are the schools that violate the rules by attempting to pay athletes rather than the cartel enforcers who keep the student-athletes from getting paid. So given this great balancing act, the NCAA is the clear choice for best monopoly in America.[14]

    c.    "Computations . . . offer evidence that the NCAA does indeed use its cartel power to pay top athletes less than their market value."[15]

## IV.   Practical Effects of Rules Restrictions

72.     Despite their astronomical profits, the practical effect of these rules restrictions is well-known and well-resourced. According to a study by Ithaca College Researchers, any institution that described an NCAA scholarship as a "full" or "free ride[]" was committing a deceptive practice. As one law review article described it:

This gap in scholarships is harmful because it creates a serious misperception of the actual financial risk associated with choosing to attend college. The financial risk is a disadvantage that student-athletes bear. However, other scholarship-receiving students do not bear this burden from receiving their financial assistance because these non-athlete students may receive scholarship monies and other financial aid awards up to the estimated cost of attendance.

73.     The out of pocket expenses that "full-ride" scholarship athletes must pay each year to cover the "gap" includes: health insurance, transportation (back and forth to their hometown between school breaks, transportation from their off-campus housing to practice, school, etc.),

---

[14] Robert J. Barro, *The Best Little Monopoly in America*, Business Week, Dec. 9, 2002, at 22.

[15] Lawrence M. Kahn, *Markets: Cartel Behavior and Amateurism in College Sports*, Journal of Economic Perspectives, Winter 2007, at 212 (citing multiple studies).

utilities associated with off-campus housing, laundry, toiletries, geographic cost of living differentials, among others. Additionally, in certain cases, such basic necessities such as food are also not fully covered. The problem is, the maximum meal plan is not enough and lack of food forces student athletes to come up with the money to bridge the gap between what the NCAA allows and what it actually takes to fully feed the student athletes.

74. Similarly, certain costs associated with off-campus housing are also not included in the GIA and have resulted in players, at some schools, receiving welfare including Section 8 (government-funded) housing in order to afford housing costs.

75. Additionally, cost-of-living geographic considerations are not addressed in current scholarships. The NCAA does not allow member institutions to provide coverage for expenses like housing (other than on-campus room and board) and utilities. Therefore, students attending schools in more expensive cities would pay more than students attending schools in less expensive cities. For example, someone going to school at UCLA would pay 54% more for his incidental expenses than someone attending Iowa State University. And because these additional expenses are not absorbed by the student-athlete's scholarship, the student-athlete is on the hook.

76. Even with a "full ride" scholarship, athletes may have to pay for certain books because the full cost of books is not actually covered by a GIA if the cost of the book is more than a standard allowance (which is the case usually with regard to upper- level courses). The same issue exists with regard to certain fees.

77. Some athletes were forced to sell their blood plasma to plasma banks during the football season to have additional income for spending on such basic items as food.

78. In addition to the very real effects of experiencing hunger and fatigue from having insufficient food during the football season or donating plasma during the football season, athletes can experience significant life-altering negative effects of having to bridge this gap-- ranging from graduating from college with thousands of dollars in credit card debt (because they had no other resources to cover those expenses not included in a GIA to being in so much financial debt in their first two years of college that they are unable to continue their educations,

to outright rule violations such as accepting money from agents to help provide assistance to themselves and their families.

79.     In 2013 when the NCAA proposed a change to the rules to permit conferences to allow member institutions to award $2000 stipends above the GIA, the NCAA recognized that the "full ride" scholarship award was no longer appropriate and unfairly deprived student-athletes of adequate scholarships. Further, the proposed rule change supports the notion that student-athletes have suffered at least $2000 per student in losses because of Defendants' anti-competitive GIA cap. The proposal has not been adopted.

80.     Again, on April 15, 2014, only eight days following the comments of Shabazz Napier, the University of Connecticut senior All-American guard, that he went to bed hungry on certain occasions while receiving a "full" GIA scholarship, the NCAA's legislative council approved a proposal expanding the meal allowance for all athletes. The NCAA stated the rule change was not in response to Napier's comments, however, the timing of the rule change cannot be ignored. The reflexive rule change further establishes that the NCAA's GIA restrictions and other similar rules are arbitrary, unnecessary, and not justified by competitive balance or amateurism. On information and belief, to date no FBS or player has received any additional funding over the full GIA.

## V.      The NCAA'S Bylaws - Illegal Agreements to Restrain Trade

81.     The NCAA and its members govern themselves through the NCAA's "Manuals," promulgated yearly, with additional quarterly updates. The Manuals include, among other things, the NCAA's Constitution and Operating Bylaws. Through the NCAA Constitution and Bylaws, the NCAA and its members have adopted regulations governing all aspects of both men's and women's college sports.  The NCAA Constitution and Bylaws were adopted by votes of the member institutions and may be amended by votes of the member institutions.[16]  Thus, the rules set forth in the NCAA Constitution and Bylaws constitute express, horizontal agreements among the NCAA, its conferences, and its members. Defendants' anticompetitive rules are strictly

---

[16] *See*, *e.g.*, NCAA Constitution Article 5.01.1 ("All legislation of the Association that governs the conduct of the intercollegiate athletics programs of its member institutions shall be adopted by the membership in Convention assembled.").

enforced and include stiff penalties for any institution or players that do not abide by Defendants'

price-fixing agreement, including a boycott of any member institutions or players that do not

comply.

82.     Defendants' anticompetitive agreements that are the subject of this action are

memorialized in the NCAA's rule book, the NCAA D-IA Manual, and the rulebooks of each of

the Conference Defendants.

83.     This action challenges as anticompetitive and unlawful all NCAA rules, and the

rules of each Conference Defendant, applicable to the FBS Football Players Market that prohibit,

cap, or otherwise limit the remuneration that players in each of these markets may receive for

their athletic services.[17]

84.     NCAA Bylaw 15.1, titled "Maximum Limit on Financial Aid - Individual," limits

the financial aid a student-athlete may receive based on athletic ability to "the value of a full

grant-in-aid." Bylaw 15.02.5 defines a "[a] full grant-in-aid" as "financial aid that consists of

tuition and fees, room and board, and required course-related books."[18]

85.     Other NCAA Bylaws reinforce this cap on student-athlete remuneration. Bylaw

12.01.1 states that "[o]nly an amateur student-athlete is eligible for intercollegiate athletics

participation in a particular sport." Bylaw 12.1.2 states that:

> An individual loses amateur status and thus shall not be eligible for
> intercollegiate competition in a particular sport if the individual:
>
> (a)     Uses his or her athletics skill (directly or indirectly)
>         for pay in any form in that sport. . . . . . ."
>
> (b)     Accepts a promise of pay even if such pay is to be
>         received following completion of intercollegiate
>         athletics participation;
>
> (c)     Signs a contract or commitment of any kind to play
>         professional athletics, regardless of its legal

---

[17] These rules, individually and as interpreted and in conjunction with each other, include but are
not limited to the following NCAA Bylaws: 12.01.4, 12.1.2, 12.1.2.1, 13.2.1, 13.2.1.1, 13.5.1,
13.5.2, 13.6.2, 13.6.4, 13.6.7.1, 13.6.7.4, 13.6.7.5, 13.6.7.7, 15.01.2, 15.02.2, 15.02.5, 15.1,
16.02.3, 16.1.4, and 16.11.2.

[18] Ironically, although student-athlete remuneration is limited to the capped GIA, NCAA Article
11 permits coaches to receive a benefit that is "in excess of full grant-in-aid based on non-resident
status." Article 11, Figure 11-1.

enforceability or any consideration received, except as permitted in Bylaw 12.2.5.1;

(d)    Receives directly or indirectly, a salary, reimbursement of expenses or any other form of financial assistance from a professional sports organization based on athletic skill or participation, except as permitted by NCAA rules and regulations;

(e)    Competes on any professional athletics team per Bylaw 12.02.8 even if no pay or remuneration for expenses was received, except as permitted in Bylaw 12.2.3.2.1;

(f)    After initial full-time collegiate enrollment, enters into a professional draft (see Bylaw 12.2.4); or

(g)    Enters into an agreement with an agent.

86.    Bylaw 12.1.2.1 sets forth in detail a multitude of rules about the forms of prohibited payment, including but not limited to: any salary, cash, unauthorized educational expenses, and "preferential treatment, benefits, and services." Bylaw 12.02.7 states that "[p]ay is the receipt of funds, awards or benefits not permitted by the governing legislation of the Association for participation in athletics." Bylaw 12.01.4, titled "Permissible Grant-in-Aid," states that "[a] grant-in-aid administered by an educational institution is not considered to be pay or the promise of pay for athletics skill, provided it does not exceed the financial aid limitations set by the Association's membership." Bylaw 12.1.2.1, titled "Prohibited Forms of Pay," states that "'[p]ay,' as used in Bylaw 12.1.2 above, includes, but is not limited to the following: . . . Educational expenses not permitted by the governing legislation of this Association (see Bylaw 15 regarding permissible financial aid to enrolled student-athletes)." Bylaw 16 further prohibits benefits based on athletic ability. See Bylaw 16.11.2 (stating that "The student-athlete shall not receive any extra benefit."); Bylaw 16.02.3 (broadly defining what constitutes an "extra benefit").[19] Bylaw 13 restricts NCAA member schools from providing prospective athletes with recruiting inducements.[20]

---

[19] Bylaw 16's prohibition on student-athlete remuneration even extends beyond graduation. Bylaw 16.1.4, which prohibits student-athletes from selling, exchanging, or assigning any award received for participating in NCAA athletes, has been interpreted to apply in perpetuity.

[20] See, e.g., Bylaw 13.2.1 (prohibiting an "institution's staff member or any representative

*Footnote continued on next page*

87.     Bylaw 15.01.2 states that "[a]ny student-athlete who receives financial aid other than that permitted by the Association shall not be eligible for intercollegiate athletics."

88.     The NCAA Bylaws, therefore, restrict student-athlete remuneration to a GIA, which is less than the full Cost of Attendance at any member institution. The Cost of Attendance is separately and more broadly defined by NCAA D-IA Bylaw 15.02.2 to be "an amount calculated by an institutional financial aid office, using federal regulations, that includes the total cost of tuition and fees, room and board, books and supplies, transportation, and other expenses related to attendance at the institution."[21]

89.     As NCAA members, Conference Defendants have agreed to the above rules. In addition, Conference Defendants have their own rules which may be more restrictive, but not more liberal, than the NCAA's rules.[22] For example:

---

*Footnote continued from previous page*

. . . making arrangements for or giving or offering to give any financial aid or other benefits to a prospective student-athlete or his or her relatives or friends, other than expressly permitted by NCAA regulations."); Bylaw 13.2.1 (listing specific items that are prohibited, including items like cash, loans, clothing, employment arrangements, and "any tangible item."); Bylaws 13.5.1 & 13.5.2 (limiting transportation that can be provided to prospective student-athletes); Bylaw 13.6.2 (limiting a member institution to financing only one visit to campus for a prospective student-athlete); Bylaw 13.6.4 (limiting official visits to 48 hours); Bylaw 13.6.7.1 (limiting entertainment during official visits to the prospective student-athlete and their parents, legal guardians, or spouse and to within a 30-mile radius of the institution's main campus); Bylaw 13.6.7.4 (prohibiting the institution from providing cash to a prospective student-athlete for entertainment purposes); Bylaw 13.6.7.5 (allowing only $40 per day of a prospective student-athlete's visit to be used by a student host for entertaining the student host, the prospective student-athlete, and the prospective student-athlete's parents, legal guardians, or spouse, excluding means and admission to campus athletic events); Bylaw 13.6.7.7 (limiting the meals to three meals "comparable to those provided to student-athletes during the academic year" and a "reasonable snack (*e.g.*, pizza, hamburger)")

[21] NCAA Bylaw 15.02.2.1, titled "Calculation of Cost of Attendance," further states: "An institution must calculate the Cost of Attendance for student-athletes in accordance with the cost-of-attendance policies and procedures that are used for students in general. Accordingly, if an institution's policy allows for students' direct and indirect costs (*e.g.*, tuition, fees, room and board, books, supplies, transportation, child care, cost related to a disability and miscellaneous personal expenses) to be adjusted on an individual basis from the institution's standard cost figure, it is permissible to make the same adjustment for student-athletes, provided the adjustment is documented and is available on an equitable basis to all students with similar circumstances who request an adjustment." Therefore, for every member of each of the proposed Subclasses, each university has already calculated his or her Cost of Attendance figure, per NCAA requirements.

[22] *See* NCAA Bylaw 5.2.2 (stating that "[e]ach division may adopt legislation to be included in the operating bylaws of the Association, which provide rules and regulations not inconsistent with the provisions of the constitution . . . .")

---

a. Big Ten Bylaw 14.01.3 ("Compliance with NCAA and Conference Legislation"): "The Constitution and Bylaws of the National Collegiate Athletic Association shall govern all matters of student-athlete eligibility except to the extent that such rules are modified by the Conference Rules and Agreements."

b. ACC Constitution Article II, Section II-1(e) ("General Purpose"): "The Conference aims to "[c]oordinate and foster compliance with Conference and NCAA rules." ACC Bylaw Article II: "Member institutions are bound by NCAA rules and regulations, unless Conference rules are more restrictive." ACC Bylaw Article III, Section III-1 states that it is the ACC Commissioner's duty to "[i]nterpret and enforce all rules and regulations of the Conference and of the NCAA."

c. Big 12 Bylaw 1.3.2 ("Adherence to NCAA Rules"): "All Members of the Conference are committed to complying with NCAA rules and policies . . . In addition, the conduct of Members shall be fully committed to compliance with the rules and regulations of the NCAA and of the Conference. . . . . . ." Big 12 Bylaw 6.1 ("Eligibility Rules"): "A student-athlete must comply with appropriate minimum requirements of the NCAA and the Conference in order to be eligible for athletically-related aid, for practice, and/or for competition in any intercollegiate sport." Big 12 Bylaw 6.5.3 ("Financial Aid Reports"): "Each institution shall comply with all financial aid legislation of the NCAA and the Conference. A copy of the Squad List for each sport shall be submitted to the Conference office prior to the first competition in each sport and at the conclusion of the academic year."

d. Pac-12 Bylaw 4.2 ("Application of NCAA Legislation"): "The Conference is a member of the NCAA, therefore, all member institutions are bound by NCAA rules and regulations unless the Conference rules are more demanding." Pac-12 Bylaw 2.4 ("Termination, Suspension and Probation"): "The Conference may place a member on probation or suspension, or terminate its membership . . . for . . . [m]aterially violating the standards and requirements of the Conference . . . [or] [v]iolating rules and regulations of the NCAA . . . ." Pac-12 Executive Regulation 3-1: "The rules of the National   Collegiate Athletic Association shall govern all matters concerning financial aid to student athletes except to the extent that such rules are modified by the CEO Group."

e. SEC Bylaw Article 5.01.1 ("Governance"): "The Conference shall be governed by the Constitution, Bylaws, and other rules, regulations, and legislation of the Conference and the NCAA." SEC Bylaw Article 15.01 ("Institutional Financial Aid Permitted"): "Any scholarship or financial aid to a student-athlete must be awarded in accordance with all NCAA and SEC regulations."

f. Conference USA Bylaw Article 1.02 ("Purpose"): "The purpose of the Conference is to . . . regulate their respective varsity intercollegiate athletic programs within the context of higher education and the [NCAA].. . . In furtherance of such purpose, it is intended that the Conference will . . . Provide a compliance program to assist member institutions in complying with NCAA, Conference and institution rules and regulations.

g.   MAC Conference Bylaws Chapter 1.04 "The MAC is a member of the National Collegiate Athletic Association (NCAA) and is bound by its standards and rules unless MAC rules are more demanding or strict." MAC Constitution Article II ("Purposes") "The members of the Mid-American Athletic Conference ascribe to: . . . Compliance with and vigilant enforcement of Conference and NCAA rules." Article IV(F) ("Membership") "In accordance with D-IA requirements adopted by the Council of Presidents, each institution of the Mid-American Conference has an obligation to achieve and maintain NCAA D-IA standards. Failure to satisfy these requirements will have direct consequences."

h.   MWC Conference Bylaw Article 1.01 ("Members: Qualifications") "All Member Institutions and all future members of the Conference agree to abide by and fully comply with the rules and regulations of the [NCAA]."

90.    Upon information and belief, American Conference, Atlantic Sun Conference, and Sun Belt Conference have similar bylaws as above but require member access to obtain or view their bylaws.

91.    Conference Defendants also agree to abide by NCAA rules as part of their membership in the Bowl Championship Series ("BCS").

92.    Pursuant to NCAA rules, and therefore necessarily the Conference Defendants' rules as well, the GIA is also expressly restricted below the level that would prevail in a market free of anticompetitive collusion. As described herein, absent collusion regarding GIA's, Conference Defendants and other NCAA member institutions would raise the amount they offer to athletes in the FBS Football Players Market above the current maximum allowed GIA.

93.    Defendants' collusive GIA cap clearly does not properly compensate players for Cost of Attendance or their services. According to a NCAA study, the average number of hours athletes reported being engaged in both athletic and academic activities amounted to 81.3 for those in FBS programs. The average number of hours athletes devoted to athletic activities in season was 43.3 for FBS football players.[23]

---

[23] *See* Jason Belzer & Andy Schwarz, *National Letter of Indenture: Why College Athletes are Similar to Indentured Servants of Colonial Times*, FORBES (July 25, 2012), http://www.forbes.com/sites/darrenheitner/2012/07/25/national-letter-of-indenture-why- college-athletes-are-similar-to-indentured-servants-of-colonial-times/; *see also* Billy Hawkins, THE NEW PLANTATION: BLACK ATHLETES, COLLEGE SPORTS, AND PREDOMINANTLY WHITE INSTITUTIONS (2010); Richard Johnson, *Submarining Due Process: How the NCAA uses its Restitution Rule to Deprive College Athletes of Their Right of Access to Courts. . .Until Oliver v. NCAA*, FLORIDA COASTAL LAW REVIEW (November 16, 2010), www.fcsl.edu/sites/fcsl.edu/files/Johnson.pdf; Steve Wieberg, *NCAA survey delves into practice*
*Footnote continued on next page*

94.     The NCAA's Constitution and Bylaws further contain extensive provisions, constituting express horizontal agreement among competitors, which require NCAA members to abide by all provisions of the NCAA's Constitution and Bylaws, including the GIA limitation at issue in this action.[24]

95.     The NCAA strictly enforces its anticompetitive GIA cap through additional rules and regulations that punish anyone who deviates from Defendants' anticompetitive restrictions.[25] For example, the NCAA enforces the agreed upon GIA cap through a further agreement under which any college athlete who receives athletics-based financial aid in excess of the GIA cap is ineligible to compete in NCAA sports. See Bylaw 15.01.2.

96.     NCAA members have also set up elaborate and sophisticated mechanisms to monitor compliance and penalize violations of the GIA restrictions. For instance, the NCAA requires members to report each athlete's financial aid information to the NCAA on or before the first day of outside competition for the sport in which the athlete participates. This information is compiled in a form known as a "Squad List" and each Conference Defendants' member school maintains control of this document. See NCAA Bylaws 15.5.11. The NCAA makes available to its members, at no charge, compliance software that applies NCAA regulations to athletes' information, generates reports to the NCAA, and warns the member when the jointly imposed

---

*Footnote continued from previous page*
*time, coaches' trust*, USA Today http://usatoday30.usatoday.com/sports/college/2011-01-14-ncaa-survey_N.htm (Jan. 5,2011).

[24] *See, e.g.*, NCAA Constitution Article 1.3.2 (stating that "[l]egislation governing the conduct of intercollegiate athletics programs of member institutions shall apply to basic athletics issues such as admissions, financial aid, eligibility and recruiting. Member institutions shall be obligated to apply and enforce this legislation . . ."); Article 2.8.1 (stating that "Each institution shall comply with all applicable rules and regulations of the Association in the conduct of its intercollegiate athletics programs," and that "[m]embers of an institution's staff, student-athletes, and other individuals and groups representing the institution's athletics interests shall comply with the applicable Association rules, and the member institution shall be responsible for such compliance.") ; Article 3.1 (reiterating that "institutions or organizations must accept and observe the principles set forth in the constitution and bylaws of the Association."); Article 3.2.1.2 (stating that "[t]he institution shall administer its athletic programs in accordance with the constitution, bylaws and other legislation of the Association.").

[25] *See* NCAA Constitution Article 1.3.2 (stating "Member institutions shall be obligated to apply and enforce this legislation, and the enforcement procedures of the Association shall be applied to an institution when it fails to fulfill this obligation."); NCAA Constitution Article 2.8.3 (stating "An institution found to have violated the Association's rules shall be subject to such disciplinary and corrective actions as may be determined by the Association.").

1  limit on an athlete's financial aid has been exceeded. Violations are adjudicated and penalties

2  imposed by competing member institutions.

3        97.    Punishments for any D-IA member that fails to abide by the NCAA's

4  anticompetitive rules are severe, including a complete ban on athletic participation (known as the

5  "death penalty") and a reduction in the amount of GIAs a school may offer.[26]

6        98.    In addition to regulating its member institutions, the NCAA also directly regulates

7  college athletes. For example, the NCAA Bylaw 14.1.3 states that each year, a college athlete

8  "shall sign a statement in a form prescribed by the Legislative Council . . . related to . . .eligibility

9  . . . financial aid, amateur status . . . [f]ailure to complete and sign the statement shall result in the

10  student-athlete's ineligibility for participation in all intercollegiate competition." Bylaw 14.01.3

11  states that, to be eligible, "a student-athlete shall be in compliance with all applicable provisions

12  of the constitution and bylaws of the Association and all rules and regulations of the institution

13  and the conference, if any, of which the institution is a member." Bylaw 14.1.1 states that, "[t]o

14  be eligible for regular- season competition, NCAA championships, and for postseason football

15  games, the student-athlete shall meet all general eligibility requirements." Constitution Article

16  3.2.4.3 states that, "[t]he institution shall be obligated immediately to apply all applicable rules

17  and withhold ineligible student-athletes from all intercollegiate competition." In other words, the

18  NCAA mandates a collective boycott by all members of any athlete found to have deviated from

19  the price-fixing activity alleged in this Complaint.

20        99.    In addition, the NCAA mandates a collective boycott by all members of any

21  schools found to have deviated from Defendants' price-fixing activities alleged in this complaint.

22  See Constitution Article 3.2.4.11 (titled "Discipline of Members," and stating that, "active

23

---

[26] *See* NCAA Constitution Article 1.3.2 (stating that "the enforcement procedures of the
Association shall be applied to an institution when it fails to fulfill this obligation" to apply and
enforce NCAA legislation.); Article 2.8.3 (stating "[a]n institution found to have violated the
Association's rules shall be subject to such disciplinary and corrective actions as may be
determined by the Association."); Article 3.2.5.1 (stating that "[t]he membership of any active
member . . . failing to meet the conditions and obligations of membership may be suspended,
terminated or otherwise disciplined . . . ."); Article 3.01.4 (stating that "[a]ll rights and privileges
of a member shall cease immediately upon termination or suspension of its membership.");
Article 3.2.5.1.1 (stating that "[a]ll rights and privileges of the member shall cease upon any
termination or suspension of active membership.").

1   members shall refrain from athletics competition with designated institutions as required under

2   the provisions of the Association's enforcement procedures.").

3          100.    Because NCAA rules prohibit NCAA members from playing games with non-

4   NCAA members, any institution that is expelled from the NCAA for violating the NCAA's

5   anticompetitive rules is effectively banned from participating in major college sports. The NCAA

6   therefore not only expressly requires its member institutions to adopt its anticompetitive regime,

7   but also has built in mechanisms to ensure that no members or group of members can defect,

8   thereby keeping Defendants' cartel intact.

9          101.    Accordingly, all NCAA members are forced to abide by Defendants'

10  anticompetitive rules and become co-conspirators in Defendants' restraint of trade or face

11  significant punishment.

12         102.    As a direct result of the NCAA rules embodied in the GIA cap, no NCAA member

13  school has provided any college athlete with athletic-based financial aid in excess of the GIA cap,

14  other than a few noted "scandals" in which the NCAA imposed punishment on schools for

15  exceeding the cap through the provision of "under-the-table" benefits.

16  **VI.    NCAA Institutions Otherwise Compete for Player Services**

17         103.    Within the confines of the NCAA's GIA cap, NCAA D-I member institutions

18  fiercely compete for the top prospective college football players. Absent Defendants'

19  anticompetitive agreement, there is no question that such competition would include competition

20  on remuneration for players' services and such remuneration would far exceed Defendants'

21  artificially imposed GIA cap.[27]

22         104.    Recruiting top athlete talent for the FBS is critical to NCAA member institutions

23  because, as established *supra*, FBS is big business, and the financial success of NCAA member

24  institutions is directly tied to the talent of their athletes and success of their FBS programs.

25         105.    Top prospective FBS recruits are tracked from freshman year of high school,

26  sometimes even earlier. Media sport giants ESPN and Yahoo! Sports create and track profiles of

---

[27] It has been estimated that to fully cover the Cost of Attendance for the 85 scholarship players at
each of the 117 FBS football teams would cost over $40 million. This is just a tiny fraction of the
profits generated each year by these players. See NCAP-Drexel Study at 14.

1   thousands of high school football players, and numerous scouting services and publications

2   likewise track top prospects and sell subscriptions containing detailed statistics and other

3   information on such players. On National Signing Day, typically the first Wednesday in February

4   for football, top high school football players hold nationally televised press conferences to

5   announce for which NCAA member institution they will play.

6        106.    Unable to offer players any compensation beyond the NCAA's price-fixed GIA,

7   NCAA member institutions compete for players by pouring millions of dollars into their stadiums

8   and arenas, building state-of-the-art training facilities and luxury locker rooms, and offering

9   players deluxe dorm rooms and extensive tutoring services. NCAA member institutions also pay

10  top-dollar for the best coaches to lure prospective players with hopes of reaching the NFL.

11  Because there are no artificial restraints on the coaches' compensation, coaches' salaries are often

12  in the millions per year. Conversely, because of the NCAA bylaws, the athletes that are

13  performing on the field or court do not even receive enough in athletic-scholarships to cover their

14  cost of attending the universities or colleges for which they generate millions of dollars. Absent

15  such artificial restraints, the NCAA member institutions would compete for players' services by

16  offering them remuneration beyond the GIA cap and beyond the true Cost of Attendance resulting

17  in the players receiving fair compensation for their services.

18  **VII.    Defendants' Restraints Have No Justifiable Pro-Competitive Effect**

19       107.    Defendants' conduct is per se illegal under the Sherman Act for which no pro-

20  competitive justification should be allowed. Nevertheless, even if such a justification were

21  allowed as a defense there are no pro-competitive justifications for Defendants' anticompetitive

22  agreements. Defendants will likely argue that their anticompetitive rules are necessary to maintain

23  competitive balance between and among the NCAA D-I institutions. However, the reality is that

24  there is not a competitive balance between and among the NCAA institutions, and therefore, no

25  competitive balance for the NCAA to protect. Competitive balance is particularly lacking in FBS

26  programs.

27       108.    For example, no school outside of a Power Conference, with the sole exception of

28  Notre Dame, has ever played in the BCS championship game in the sixteen years of the BCS's

1    existence. Only seven non-Power Conference schools have even appeared in any of the seventy-

2    two BCS bowl games played over the past sixteen years and these non-Power Conference schools

3    secured just ten of the 144 possible berths in those games. Because the demand for Power

4    Conference football is so much greater than non-Power Conference football, Power Conference

5    teams dominate in generating income including via lucrative broadcasting rights that are often

6    conference and sometimes even school specific.

7         109.   Competitive balance likewise does not even exist among the Power Conference

8    schools. For example, 2008 revenues for traditional FBS power-house schools like Alabama

9    ($123,769,841) and Texas ($120,288,370) dwarf those of fellow Power Conference schools like

10   the University of Oregon ($56,623,901) and Iowa State ($38,621, 346).[28]

11        110.   There is no question that less restrictive alternatives exist to Defendants'

12   anticompetitive practices. There is no valid reason that there is not a free market for player

13   services in the same way that there is a free market for coaches' services. Restrictions on players'

14   commercial opportunities, similar to the Olympic model, would further allow players access to

15   the free commercial market where they could sign endorsement deals, get paid for signing

16   autographs, and receive payments when entities use their rights of publicity.

17   **VIII.   Defendants' Anticompetitive Conduct Causes Plaintiffs and the Class Irreparable
            Harm**

18

19        111.   Plaintiffs have no reason to believe that Defendants' will cease their

20   anticompetitive conduct in the relevant markets. Absent Defendants' unlawfully restrictive rules,

21   Plaintiffs and members of the Class would be able to seek and would receive remuneration for

22   their athletic services above Defendants' GIA cap.

23        112.   If Defendants' actions are not enjoined, Plaintiffs and members of the Class will

24   suffer severe and irreparable harm. Monetary damages alone will not fully compensate Plaintiffs

25   and members of the Class for the injuries inflicted upon them by Defendants' unlawful restraints.

26   These threatened injuries to Plaintiffs and members of the Class warrant injunctive relief.

27

28   ----
     [28] *See* ESPN College Sports, *College Athletic Revenues and Expenses – 2008*.

113. For the vast majority of members of the Class, their athletic services for Defendants represent their last opportunity to realize financial compensation for their athletic talents. Statistics demonstrate that only a tiny percentage will play in the NFL. Therefore, the majority of members of the Class will never realize any economic benefit beyond the artificially and anticompetitively capped GIA for their athletic talents - talents which generate billions of dollars annually for Defendants.

## ANTITRUST ALLEGATIONS

114. Defendants' contract, combination, and conspiracy described herein consist of a continuing horizontal agreement, understanding, and concert of action among the Defendants and their co-conspirators, the substantial terms of which are to artificially fix, depress, maintain, and/or stabilize prices received by Plaintiffs and members of the Class for their collegiate football athletic services in the United States, its territories, and possessions.

115. Defendants' and their co-conspirators' actions also constituted and continue to constitute a group boycott and refusal to deal.

116. In formulating and effectuating the contract, combination, or conspiracy, Defendants and their co-conspirators did those things that they unlawfully combined and conspired to do, including, among other things:

   a. agreeing to artificially fix, depress, maintain, and/or stabilize prices paid to Plaintiffs and members of the Class for their collegiate athletic services;

   b. agreeing to boycott any institutions or players who refuse to comply with Defendants' and their co-conspirators' price-fixing agreement; and

   c. implementing, monitoring and enforcing the conspiracy among Defendants and their co-conspirators.

117. The activities described herein have been engaged in by Defendants and their co-conspirators for the purpose of effectuating the unlawful agreement to fix, depress, maintain and/or stabilize prices paid to Plaintiffs and members of the Class for their collegiate football athletic services.

118. Defendants' actions constitute an unreasonable restraint of trade.

**CLAIM FOR RELIEF**

**Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1**

119.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in this Complaint.

120.     During the relevant period, Defendants combined, conspired, and agreed to fix, maintain, and suppress the remuneration for the services of members of the Class in violation of Section 1 of the Sherman Act.

121.     Defendants' restraints also constitute an unlawful group boycott of or refusal to deal with any institutions or players that do not comply with Defendants' unlawful price-fixing of remuneration for player services.

122.     Defendants' anticompetitive conduct has restrained, and will continue to restrain unless enjoined, the amount, terms, and condition of remuneration to Plaintiffs and members of the Class for their athletic services, depriving Plaintiffs and the Class of the benefits of a competitive market for their services.

123.     As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiffs and members of the Class have been, and will continue to be, injured and financially damaged in amounts to be determined.

124.     Defendants' horizontal price-fixing agreement, group boycott and refusal to deal are per se unlawful under the federal antitrust laws.

125.     Defendants' horizontal pricing-fixing agreement, group boycott and refusal to deal also constitute an unreasonable restraint of trade under the Rule of Reason, whether under a "quick look" or full-blown Rule of Reason analysis. Defendants have market power in the relevant markets for the services of top-tier college football players.

126.     Defendants' pricing-fixing agreements and group boycott are naked restraints of trade without any pro-competitive purpose or effect. Defendants' and their co-conspirators' sole purpose is to enhance revenue for themselves by eliminating competition for player services, artificially depressing remuneration for player services, and reducing costs for Defendants and their co-conspirators. The anticompetitive effects of Defendants' conduct substantially outweigh

1  any alleged pro-competitive effects or justifications that may be offered by Defendants, including

2  their self-claimed and factually unsupportable claim of "amateurism."

3      127.    Less restrictive means can be implemented to achieve any purported pro-

4  competitive justification Defendants may posit.

5      128.    Monetary damages alone are not sufficient to compensate Plaintiffs or members of

6  the Class or Subclasses for the irreparable harm they have suffered and will continue to suffer,

7  warranting injunctive relief.

8      129.    Plaintiffs and the Class are entitled to a declaratory judgment declaring as void and

9  unenforceable the NCAA Bylaws and other rules that cap GIAs and otherwise limit player

10  remuneration. Plaintiffs and members of the Class and each Subclass are entitled to a permanent

11  injunction that enjoins Defendants from engaging in the ongoing violations described in this

12  Complaint.

13      130.    Plaintiffs and members of the Class are further entitled to trebled damages, as well

14  as, an award of reasonable attorneys' fees and costs of suit.

15                          **PRAYER FOR RELIEF**

16      WHEREFORE, Plaintiff and members of the Class request:

17      A.      That the Court determine that the claims alleged herein may be maintained as a

18  class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and that

19  Plaintiffs be found to be adequate representatives of the Class;

20      B.      That the Court determine that Defendants' and their co-conspirators' rules and

21  agreements that prohibit, cap, or otherwise limit remuneration and benefits to Plaintiff and

22  members of the Class for their athletic services to Defendants and their member institutions

23  violate Section 1 of the Sherman Act;

24      C.      Plaintiff and the Class recover damages as provided by law, and that a joint and

25  several judgment in favor of Plaintiff and the Class be entered against Defendants in an amount to

26  be trebled in accordance with the antitrust laws;

27      D.      Defendants and their co-conspirators be enjoined from applying their

28  anticompetitive rules restraining Defendants' member institutions in negotiating, offering, or

1181852.6                          - 36 -                          CLASS ACTION COMPLAINT
                                                                    CASE NO. 14-3159

1   providing remuneration to members of the Class as compensation for their athletic services;

2         E.      Plaintiff and the Class be awarded their costs and disbursements in this action,

3   including reasonable attorneys' fees and pre- and post-judgment interest; and

4         F.      That the Court grant Plaintiff and the Class such other, further, and different relief

5   as the case may require and the Court may deem just and proper under the circumstances.

6                              **JURY TRIAL DEMAND**

7         Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by

8   jury for all issues so triable.

9   Dated: July 11, 2014

10

11                              By: */s/ Eric B. Fastiff*
                                    Eric B. Fastiff

12                              Eric B. Fastiff (State Bar No. 182260)
                                efastiff@lchb.com
13                              Brendan P. Glackin (State Bar No. 199643)
                                bglackin@lchb.com
14                              Lin Y. Chan (State Bar No. 255027)
                                lchan@lchb.com
15                              Katherine C. Lubin (State Bar No. 259826)
                                klubin@lchb.com
16                              LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                275 Battery Street, 29th Floor
17                              San Francisco, CA 94111-3339
                                Telephone: (415) 956-1000
18                              Facsimile: (415) 956-10008

19                              Wendy R. Fleishman
                                wfleishman@lchb.com
20                              LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                250 Hudson Street, 8th Floor
21                              New York, NY 10013-1413
                                Telephone: (212) 355-9500
22                              Facsimile: (212) 355-9592

23                              Brad R. Sohn
                                brad@sohn.com
24                              THE BRAD SOHN LAW FIRM, PLLC
                                2211 S.W. Secoffee Terrace
25                              Miami, FL 33133
                                Telephone: (310) 866-0001
26                              Facsimile: (305) 397-0650

27                              *Attorneys for Plaintiff Dax Dellenbach*

28